**UNITED PACIFIC INSURANCE COMPANY**

v.

**The UNITED STATES.**

No. 119–61.

United States Court of Claims.
June 10, 1966.

Edward Gallagher, Washington, D. C., attorney of record, for plaintiff.

Gerson B. Kramer, Washington, D. C., with whom was Asst. Atty. Gen. John W. Douglas, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS and COLLINS, Judges.

## OPINION

COWEN, Chief Judge.

Plaintiff, a surety company which issued payment and performance bonds on

two Government construction contracts under the Miller Act (40 U.S.C. § 270a et seq.), sues to recover from the United States the proceeds of a check alleged to have been illegally disbursed by the Government to the contractor, who proceeded to cash the same and retain the funds.

Fred H. Stegeman, an individual doing business as Fred H. Stegeman and Associates, entered into two contracts with the Federal Bureau of Public Roads for the grading, surfacing, and bridging of certain roads in Oregon, respectively designated the Mt. Hood and Whittaker Creek projects. Under the Mt. Hood contract plaintiff furnished a performance bond, guaranteeing performance of the work, in a penalty of $249,680.65, and under the Whittaker Creek contract, a performance bond in a penalty of $53,-504.10. Payment bonds were executed under both contracts, assuring payment of all labor and material bills incurred in connection with the work. The two projects were eventually completed, but the contractor left unpaid material bills that plaintiff, pursuant to its surety obligation, was compelled to satisfy. A total of $46,586.51 was paid by plaintiff to materialmen, $17,000 on the Mt. Hood job, and $29,586.51 on the Whittaker Creek. At issue in the case is the Government's final payment of $41,624.79 to the contractor under the Mt. Hood contract.[1] Plaintiff hopes, in short, to recoup the bulk of its loss on the two payment bonds by recovering the full amount of this check from defendant.

At the trial in this court, it was stipulated by defendant's attorney and the attorney for the trustee in bankruptcy that out of the proceeds of the aforesaid check cashed by the contractor, $36,500 has not come into the possession of the trustee. It was also agreed that consideration of the question of whether any portion of the balance of $5,124.79 came into the possession of the trustee will be deferred until determination of the primary issue herein between the surety and the Government.

Plaintiff's claim to recovery is based upon the contention that the authorized officials of the Bureau of Public Roads, after receiving due notice of facts giving rise to an equitable right to the contract proceeds in the surety over the contractor, and after being notified of plaintiff's assertion of such a right, paid out the proceeds in question to the contractor without any legal justification for so doing. Plaintiff claims that the facts of the present case are analogous to those in Newark Insurance Co. v. United States, 144 Ct.Cl. 655, 169 F.Supp. 955 (1959), wherein this court, confronted with issues somewhat similar to those now framed by plaintiff, awarded judgment for a surety against the United States. To decide the merits of the above contention a review of the salient facts of the case is necessary.

Alfred G. Mansfield, an insurance agent specializing in contract bonds and insurance for contractors, wrote the bonds for Stegeman, the contractor, on both the Mt. Hood and Whittaker Creek contracts. Sometime in September of 1960, Mansfield received a copy of a letter from the Bureau of Public Roads to Stegeman acknowledging receipt of an attempted assignment of contract proceeds by Stegeman to one of his employees. Although the proposed transfer of proceeds was not effected and was ultimately rejected by the Bureau,

1. The Whittaker Creek contract was completed on September 24, 1960, and the Mt. Hood contract, on July 22, 1960. A check in payment on the Mt. Hood contract of the $41,624.79 here in dispute was issued by defendant on November 22 or 23, 1960, and cashed by the contractor on November 30, 1960. Final payment under the Whittaker Creek contract was made by defendant to the contractor's trustee in bankruptcy on March 15, 1961, in the amount of $5,239.63. By stipulation of the parties, this amount does not figure in the present case. Plaintiff has filed a claim in the bankruptcy proceedings and has received $9,663.19 from the trustee so far. Since the bankruptcy proceedings are still pending in the United States District Court for the District of Oregon, there is a possibility that plaintiff may receive an additional sum as a result of its claim.

the mere fact that such a transaction had been attempted aroused concern on Mansfield's part that Stegeman might be experiencing some financial difficulty. Consequently, he telephoned the local office of the Bureau and objected to the proposed assignment, stating that plaintiff would never consent to such action. Shortly thereafter, Mansfield was informed by an official of the Bureau that a claim had been asserted by a supplier to a subcontractor of Stegeman. No request was made by Mansfield that payments under the Stegeman contracts be withheld.

The attempted assignment came to the attention of Seymour W. Tanner, an underwriter in plaintiff's Portland, Oregon, office, at about the same time and led him, also, to suspect that Stegeman was in some distress. As a result, he began to keep check on Stegeman's financial status by making periodic inquiries to determine whether he was paying his bills promptly. In the middle of November 1960, Tanner learned that a creditor, McNeilus, had a claim for approximately $6,000 against Stegeman on the Whittaker Creek contract. On November 14, 1960, Tanner, concerned by this clear indication of financial difficulty, communicated with W. T. Peterson, chief of the Administrative Audit Section in the Portland office of the Bureau of Public Roads, and informed him of the McNeilus claim. Peterson, who was apparently unaware of the claim, responded by advising Tanner about another claim against Stegeman on the Mt. Hood contract by F. H. McEwen, in the amount of $4,800. Peterson further informed Tanner that the final voucher for the Mt. Hood contract was still in his possession and was about to be approved and paid to the contractor. Tanner requested Peterson to delay payment of the final voucher, and Peterson accommodated by agreeing to delay final payment until November 18, 1960.

Tanner also inquired as to whether it would be possible to have a representative of the surety present when the proceeds were ultimately disbursed to the contractor, but Peterson informed him that under the Bureau's normal procedure the check would be mailed directly to Stegeman.

Tanner did not make a written request to Peterson to permanently withhold final payment under the Mt. Hood contract. Peterson did not, in any case, have authority on his own to indefinitely withhold payment merely because he had discovered or had been informed that the contractor was experiencing a certain amount of financial irregularity. Approval of the contracting officer would first have to be obtained before such a serious step could be taken. At the trial here, Peterson stated that he did not recall having received a verbal request from Tanner to stop payment and noted that if he had been so requested, he would undoubtedly have automatically discussed the matter with the contracting officer and have advised the surety to make a formal request in writing.

After the above conversation had been concluded, Tanner, in accordance with company procedure, sent a preliminary loss notice to plaintiff's Tacoma, Washington, home office for the purpose of encouraging the company's claim department to protect its interests by filing a formal request for the withholding of all payments to Stegeman until appropriate action could be taken to make the company joint payee of the proceeds still due. Under plaintiff's procedure, a request to withhold payments from a contractor emanates from plaintiff's home office in Tacoma and not from the local underwriter. In this November 14, 1960, communication, the home office was informed by Tanner of the relevant facts in the case, including the exact date when final payment would be made by the Government to Stegeman. The notice contained the following statement: "Final voucher totaling $41,000 on the Mt. Hood job ready for payment this date, but Bureau has agreed to hold it until Nov. 18th. Stegeman should receive this Nov. 22nd or 23rd. Final on Whittaker Creek job will run about $6,000 and will be forwarded to Stegeman in about two

weeks. We feel that Stegeman should perhaps be consulted prior to his receipt of the $41,000 next Tuesday or Wednesday."

The final voucher was approved by the contracting officer on the next day, but Peterson, pursuant to his agreement with Tanner, held the voucher until November 18, 1960. At that time, it was scheduled for payment and forwarded to a central disbursing office. On November 22, 1960, the check for $41,624.79 was issued to the contractor, and on November 30, 1960, it was cashed by Stegeman. The proceeds have never been recovered, as Stegeman promptly disappeared (apparently to Canada) and has not been heard from since.

Not until March of the next year (some 4 months after Tanner's conversation with Peterson) did plaintiff's home office make demand upon the Bureau of Public Roads for the contract proceeds. On March 16, 1961, plaintiff's claim department wrote a letter to the Bureau requesting that it either pay the remaining funds assertedly still in its possession or take appropriate action to insure that they be disbursed for no purpose other than the payment of outstanding labor and material bills incurred and unpaid by Stegeman on the two projects. The Bureau responded, on March 27, 1961, by informing plaintiff that final settlements had already been made on both the Mt. Hood and Whittaker Creek contracts—on the Mt. Hood job by final payment to the contractor on November 23, 1960, and on the Whittaker Creek job, by final payment to the contractor's trustee in bankruptcy on March 15, 1961.[2] The Bureau concluded by stating that as a result of the above payments it had fully discharged all liability of the Government on the two contracts. Two days later, on March 29, 1961, plaintiff commenced its litigation in this court.

■ Based upon equitable considerations, a surety which has satisfied debts of a contractor to materialmen under the terms of a payment bond concededly possesses a right of subrogation to the proceeds due a Government contractor and retained by the United States. Henningsen v. United States Fidelity & Guaranty Co., 208 U.S. 404, 28 S.Ct. 389, 52 L.Ed. 547 (1908); National Surety Corp. v. United States, 132 Ct.Cl. 724, 133 F. Supp. 381 (1955), cert. denied, First Nat. Bank in Houston v. United States, 350 U.S. 902, 76 S.Ct. 181, 100 L.Ed. 793. See also Prairie State Nat. Bank of Chicago v. United States, 164 U.S. 227, 17 S.Ct. 142, 41 L.Ed. 412 (1896).

■ The right of subrogation of the surety, though superior to claims of other private parties, does not normally prevail over claims of the United States based upon debts of the contractor to it or extend to prior payments lawfully disbursed under the contract to the contractor before his default. United States v. Munsey Trust Co., 332 U.S. 234, 67 S.Ct. 1599, 91 L.Ed. 2022 (1947); Schmoll v. United States, 105 Ct.Cl. 415, 63 F.Supp. 753 (1946), cert. denied, 329 U.S. 724, 67 S.Ct. 69, 91 L.Ed. 627; National Union Fire Ins. Co. of Pittsburgh, Pa. v. United States, 157 Ct.Cl. 696, 304 F.2d 465 (1962).

■ In Newark Ins. Co. v. United States, supra, upon which plaintiff relies, the surety had advised the Government's representatives that various laborers and materialmen had not been paid by the contractor and requested that no further payments be made to him pending an investigation. Shortly thereafter, the Government was notified by the contractor, who was performing ten contracts, that he was unable to continue performance. Then the surety's officials again conferred with the Government's representatives and were assured that no further payments would be made on the contracts until the question of priority between the contractor, the contractor's assignee, and the surety had been decided by the General Accounting Office. After these events, the Govern-

2. On February 17, 1961, William Kennedy was appointed trustee in bankruptcy for Stegeman by the United States District Court for the District of Oregon.

ment learned that two of the contracts had been satisfactorily completed, and it made final payment thereon to the contractor's assignee. When the surety brought suit for the amount it had been compelled to pay laborers and materialmen involved in the performance of the two contracts, the court held that it was entitled to recover. The decision was grounded upon the determination that the Government had paid the money in dispute to a third party, *i. e.*, the assignee, after having received due notice of facts giving rise to the superior equitable right of the surety, after the surety's assertion of that right, and without a valid reason for so making the payment. The facts of the case at bar, however, fall far short of what was considered necessary in *Newark* to impose a duty on the Government to withhold the payment of any balance due on the contracts. Plaintiff has failed to establish that defendant had due notice of sufficient facts to indicate that plaintiff possessed an equitable right before the final payment of the proceeds to the contractor.

Prior to the time the final check of $41,624.79 on the Mt. Hood contract was forwarded to the disbursing office of the Bureau of Public Roads for payment to the contractor, the surety knew only that the contractor was late in paying the claims of two suppliers for the Whittaker Creek contract. At that time, neither plaintiff nor defendant knew that the Rogers Super Tread Tire Company would thereafter assert a claim against Stegeman in the amount of $17,000 for material furnished on the Mt. Hood contract. Neither plaintiff nor defendant could have then known that ultimately the contractor would be unable to pay his suppliers or would in fact abscond with the proceeds of the contract.

Under the circumstances recited, there is no factual or legal basis for holding that defendant knew that plaintiff had or would acquire an equitable right of payment superior to that of Stegeman. It is undisputed that at the time the final payment was made, Stegeman had not defaulted in the performance of his contract. Although Article 25 of the contract gave the contracting officer the right to withhold from the contractor amounts that might be necessary to pay the wages of laborers and mechanics employed on the work, the record is devoid of any evidence that there were any unpaid wages. In short, the facts which were known to the Government at the time were not such as to require it to withhold the final payment and thereby assume the risk of breaching its contractual obligations to Stegeman, or depart from its normal disbursement procedures. Plaintiff's right of subrogation at that time was only a potential one conditioned upon a default by the contractor on the payment bond, National Union Fire Ins. Co. of Pittsburgh, Pa. v. United States, supra.

The final payment to the contractor was an act in the course of usual contract administration. Unlike the situation in *Newark*, defendant was not disbursing a fund which was disputed by rival claimants, or unilaterally acting as an arbiter of a controversy between such claimants. The controversy had not yet arisen, and defendant was entitled to believe that the contractor who had already completed performance and had submitted his final voucher was the only legitimate claimant to the amount due.

Although plaintiff argues that it had asserted its equitable right and had given due notice to the defendant to stop final payment, the record does not support the contention. The only such notice that can be inferred is to be found in the conversation of November 14, 1960, between the underwriter, Tanner, and defendant's representative, Peterson. As a result of that conversation, both clearly understood that Peterson had agreed to delay the payment of the final amount due on the contract for 4 days in order to permit Tanner to notify plaintiff's home office and encourage it to file a formal claim to the proceeds. It is significant that under the procedures employed by plaintiff, requests to withhold payments from a contractor emanated from plaintiff's

home office in Tacoma and not from Tanner, the local underwriter. Plaintiff, however, failed to take advantage of Peterson's accommodating action, and the check was ultimately disbursed in accordance with normal procedure. Although plaintiff was fully informed of all the facts necessary for it to take action for the protection of its rights, it waited for some 4 months (until March 16, 1961) before communicating with the defendant and making a demand for payment. Stegeman had cashed the check and converted the proceeds long before that time, and a trustee in bankruptcy had been appointed for his estate. In short, plaintiff slept on its rights in a situation where time was a critical factor and failed to make an adequate demand on defendant to withhold contract payments pending resolution of the question regarding priorities. In the light of all the facts, it is concluded that the Government's payment to the contractor on November 22, 1960, was lawful and valid and that plaintiff's petition must be dismissed.

Having thus determined that plaintiff is not entitled to recover on account of the payment made to the contractor on the Mt. Hood contract, we do not reach the issue of whether plaintiff, by virtue of its indemnity agreement with Stegeman regarding the Whittaker Creek contract, is entitled to apply the proceeds of the Mt. Hood contract in satisfaction of the amounts it expended on the Whittaker Creek contract.[3]

### Defendant's Counterclaim

 The facts with respect to defendant's counterclaim have been stipulated by the parties and reveal that on January 10, 1955, Clarence A. Sorrells was injured on the streets of Fresno, California. Plaintiff was the insurer of the city of Fresno. On Sorrells' application, the Railroad Retirement Board paid him sickness benefits in the sum of $749. Within a short time thereafter, the Board filed with the city of Fresno a written notice of its lien, giving notice of its right to reimbursement of any sum paid by the city on account of its liability to Sorrells—all in accordance with the provisions of the Railroad Unemployment Insurance Act, 45 U.S.C. § 362(o). A similar notice was sent to plaintiff. Thereafter plaintiff entered into a written settlement with Sorrells in the amount of $3,750 but has failed and has refused to reimburse defendant for the $749 sickness benefits previously paid to Sorrells. Later, the Board received from Sorrells a reimbursement of $150, which reduced the Board's claim to $599. In view of the provisions of the cited statute and the stipulated facts, plaintiff's liability is clear and defendant is entitled to recover $599 on its counterclaim. United States v. Luquire Funeral Chapel, 199 F.2d 429 (5th Cir. 1952). During oral argument before the court, plaintiff announced that it was no longer contesting defendant's counterclaim.

in bankruptcy to defendant has become moot.